FILED
UNITED STATES DISTRICT COURT
DENVER, COLORADO

JUL 21 2025

JEFFREY P. COLWELL
CLERK

Civil Action No. _____

# IN THE

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLORADO

_____

Travis Hodge - **PLAINTIFF**

vs.

El Paso County Sheriff's Office
Sheriff Joe Roybal
John Doe Detention Bureau Chief
Deputy Payne
Deputy Lacey
John and Jane Doe Shift Supervisors
John and Jane Doe Sheriff's Deputies - **DEFENDANTS**

## PRISONER COMPLAINT

Travis Hodge, CDOC # 202334

Bent County Correctional Facility

Unit 3-C, Cell 425-B

11560 County Road FF-75

Las Animas, CO 81054

This is a civil action, filed by Travis Hodge, a pro se state prisoner, for nominal and punitive damages and injunctive relief pursuant to 42 U.S.C. Sec. 1983, 42 U.S.C. Sec. 12132, and Colorado Constitution Art. II Sec. 10.

This Court has jurisdiction to hear this complaint pursuant to 28 U.S.C. Sec. 1332 (Diversity of Citizenship); 28 U.S.C. Sec. 1331 (Federal Question); 28 U.S.C. Sec. 1367 (Supplemental Jurisdiction); and 28 U.S.C. Section 1343 (Civil Rights).

## Parties

The plaintiff, Travis Hodge, was incarcerated at the El Paso County Jail in Colorado Springs, Colorado during the events described in this complaint. He most recently resided in Germany prior to arrest, and in North Carolina prior to that.

Defendants Joe Roybal and John Doe Detention Bureau Commander were administrative officials who exercised control over the policies and practices of the El Paso County Jail during the events described in this complaint. They are sued in their individual and official capacities.

Defendant El Paso County Sheriff's Office is a local law enforcement agency which operated the El Paso County Jail during the events described in this

complaint, and implemented and enforced the policies described in this complaint. It is sued in its official capacity.

Defendant Deputy Payne was employed as a sheriff's deputy with the El Paso County Sheriff's Office during the events described in this complaint, and was responsible for the supervision and care of inmates, including the plaintiff. He is sued in his individual capacity.

Defendants John and Jane Doe Shift Supervisors were employed as supervisory sheriff's deputies during the events described in this complaint, and were responsible for decisions related to security, inmate placement, searches, disability accommodations, and other administrative matters within the El Paso County Jail. They are sued in their individual capacities.

Defendants John and Jane Doe Sheriff's Deputies were employed as sheriff's deputies with the El Paso County Sheriff's Office during the events described in this complaint, and were responsible for the supervision and care of inmates, including the plaintiff. They are sued in their individual capacities.

**Facts**

In approximately the second week of May, 2024, Plaintiff was arrested in New York after flying in from Germany, where Plaintiff had previously lived for two

years, and transported to the El Paso County Jail, operated by the El Paso County Sheriff's Office in Colorado Springs, Colorado. Upon examination during the facility's intake process, Plaintiff notified medical staff of multiple mental health disabilities, including Post-Traumatic Stress Disorder and Major Depression. Plaintiff indicated that, as a result of these disabilities, he was experiencing suicidal thoughts and wished to be placed in a mental health ward for close monitoring. Upon being notified of this, an unknown deputy in the intake area instructed Plaintiff to change into a Velcro suit and proceed, with staff escort, to the open dormitory ward "B2". Upon arrival, Plaintiff was ordered by the unknown B2 Ward Deputy to remain on his assigned bunk and not speak until the ward was "unlocked" (meaning that general movement and activities, such as showering and use of the telephone, would be allowed in the ward). This order was given in the mid-afternoon or evening, and the "unlock" period did not occur until the following day, at which time it lasted for approximately one hour. This schedule, which only permitted inmates in B2, including Plaintiff, to speak and move about the ward for one hour each day, was the standard policy of the El Paso County Sheriff's Office and Detention Bureau. Upon information and belief, the policy is still in place to this day. In addition to this restriction on speech and general movement, Plaintiff was informed that he would not be permitted to possess books

from the jail book cart, or even his mail or official notices sent to him by the jail

administration, until he was cleared by mental health staff and transferred to

another ward. As long as Plaintiff remained in B2, any mail or notices would be

held by staff. Additionally, there was no television in the B2 ward, inmates in B2

were not taken outside to designated recreation areas, and were not allowed to

purchase any items from the jail's commissary. Upon information and belief,

policies in every other ward in the facility (except for punitive segregation units,

such as B4) allow inmates to read books, possess mail, watch television, go outside

to designated recreation areas, and at least order hygiene items from the jail's

commissary.  During Plaintiff's time in B2, Deputy John Calhoun was posted to the

B2 ward alongside an unknown new deputy in training. While sitting at his desk, in

the open dormitory ward, approximately 20 feet from Plaintiff's bunk, Calhoun

stated to his coworker that the policies then in place in B2 were not put in place to

protect suicidal inmates, but rather, to make the ward uncomfortable. Calhoun

stated that, at some point in the past, B2 had a much higher occupancy level, and

the jail had implemented the policies in question to prevent "homesteading" in the

ward. At the time of Plaintiff's residency in B2, there were only between 5 to 10

inmates housed in the ward. Upon information and belief, the facility's average

daily inmate population is over 1,100.  Plaintiff remained in B2 for approximately

5

2-3 days before being moved to the open dormitory ward "F1". Plaintiff was only permitted to be moved out of B2 after falsely claiming to a mental health professional that he no longer possessed suicidal thoughts or desires. Plaintiff made this false statement solely in order to be moved out of the highly restrictive and uncomfortable environment in B2.

Upon being moved to F1, Plaintiff was informed that it was a mixed-use ward, used for the intake of new inmates, temporary housing of inmates who were withdrawing from drugs, and housing of inmates identified as having mental health issues who were subsequently placed on "transitional mental health" status (meaning no longer requiring placement in B2, but not yet ready for placement into general population). Plaintiff was a transitional mental health status inmate. As an apparent precaution for such inmates, the top tier in the ward did not have a typical metal bar handrail, but instead had a full transparent plastic wall which served to prevent inmates from jumping from the top tier. Plaintiff remained in F1 for approximately four months, at one point being moved from the top tier to the bottom tier due to stating his intent to jump from the top of the stairs. During this time, Plaintiff adhered to ward policies, which, although less restrictive than those in B2, were nonetheless more restrictive than those of the other open dormitory wards in the facility. Included among these policies were a lockdown schedule

which only permitted inmates to get off their bunks or talk for two hours at each scheduled meal time (for a total of six hours each day), a reduced dollar limit for jail commissary orders, and a complete prohibition on ordering prepared foods from the jail's kitchen through the "Trinity Takeout" commissary program. During the 18 hour daily lockdown times, inmates, including Plaintiff, were not allowed to get off their bunks except to use the restroom, and were effectively barred from talking due to a policy, enforced by defendants, which prohibited any speech which could be "heard from the desk" (a desk at which the ward deputy sat, approximately 80 feet from inmate bunks, with no meaningful sound dampening materials or objects in the path of potential noises). Inmates were not permitted to shower, use the telephone, or access the in-ward book cart during this time, either. This is contrasted against other open dormitory wards in the facility, which, upon information and belief, maintain a 14 hour daily schedule of "unlocked" time for inmates, a higher dollar limit for commissary orders, and the ability of inmates to order prepared foods from the jail's kitchen through the "Trinity Takeout" program. Upon information and belief, the policies in F1 were implemented with the same intent as those policies previously described in B2 (namely, to make the ward uncomfortable and discourage inmates from residing in the ward). On several occasions, deputies responded to idle conversation among inmates during the daily

lockdown periods with retributive measures, including threats to keep the ward locked down all day, threats to move certain inmates suspected of talking to punitive wards, threats to perform punitive searches of inmates suspected of talking, and threats to file disciplinary complaints against inmates suspected of talking. On multiple occasions, deputies followed through on these threats. While residing in F1, Plaintiff obtained a copy of the Jailhouse Lawyer's Handbook from the National Lawyer's Guild and learned of the rights afforded to inmates under the U.S. Constitution and various federal statutes. Plaintiff verbally raised the issue of the effective prohibition on talking with multiple deputies, and in writing via the facility's grievance procedure. The policy, and its routine enforcement, were not changed. Plaintiff raised the issue of discrimination in F1 verbally with inmate classification staff, multiple deputies, and in writing via the facility's grievance procedure. Plaintiff complained of discrimination in access to services and activities on the basis of a disability, in violation of the Americans With Disabilities Act, and requested that policies be changed to end such discriminatory practices. Upon information and belief, jail staff did not alter their policies. Defendants instead responded to the final step of Plaintiff's grievances by moving him, while still on transitional mental health status, to a general population ward. Multiple inmates made comments about how unusual it was to see a

transitional inmate, in a lime green uniform, placed in a general population unit. Plaintiff was placed on the top tier, in "I Bay" in the unit "E3". Unlike in F1, E3 did not have a barrier which could prevent Plaintiff from jumping from the top tier.

Plaintiff remained in E3 for approximately three months. During this time, multiple deputies enforced a no-talking policy during daytime lockdown periods which was virtually identical to the policy enforced in F1. Inmates were also, similarly, not permitted to get off their bunks during this time. The sole distinction was that this policy was enforced during the day for only one hour each day in E3, between the hours of 2 P.M. and 3 P.M. for a regularly scheduled daytime lockdown period. On several occasions, deputies responded to idle conversation among inmates during the daily lockdown period with retributive measures, including threats to keep the ward locked down for several hours, threats to move certain inmates suspected of talking to punitive wards, threats to perform punitive searches of inmates suspected of talking, and threats to file disciplinary complaints against inmates suspected of talking. On multiple occasions, the deputies followed through on these threats.

Plaintiff complained to multiple deputies while in E3, including Deputy Broske, who told Plaintiff in one conversation that the El Paso County Sheriff's Office tries

to "make this place like Rikers," and that the goal of the harsh regime is to punish

pre-trial detainees in the facility in order to discourage their re-arrest. Plaintiff,

again, filed multiple grievances related to the policy or custom of effectively

barring all conversation during daytime lockdown hours while in E3, as well as

filing grievances regarding other issues related to deputy behavior. The issues

complained of included, for example: A deputy who frequently left her post during

the day, sometimes for over an hour, without having another deputy fill in to

ensure the safety of the ward; a deputy who appeared to threaten violence against

inmates by stating that he would return the following day and "turn it the fuck up"

in a loud and aggressive tone; the imposition of mass punishment upon virtually all

inmates in the ward by a deputy due to non-dangerous contraband items (such as

extra books or empty boxes) found in the possession of a limited number of

inmates during routine searches of the ward, in apparent contravention of facility

policy requiring that due process be afforded before the imposition of such

punishments; and other issues. After filing these grievances, Plaintiff was

approached by Deputy Maltese in E3 and told that other deputies were upset that

Plaintiff was "giving them grief." Deputy Maltese's demeanor was not aggressive

or threatening, but seemed curious. Deputy Maltese stated that he didn't understand

why so many other deputies had issues with Plaintiff, when Plaintiff had never

filed a grievance against Maltese, despite Maltese having worked most weeks in F1 while Plaintiff was housed there. Plaintiff replied that Deputy Maltese was professional, and never engaged in any conduct which could have warranted the filing of a grievance. Plaintiff does not believe Deputy Maltese's conversation to have been intended to be threatening or malicious.

Approximately two weeks after this conversation, Plaintiff began receiving apparently discriminatory treatment from deputies. On October 11, 2024, E3 was subject to a "shakedown" search. Plaintiff and other inmates in the ward were placed outside in the attached recreation area for approximately one hour while deputies searched the ward. Upon returning to his bunk, Plaintiff noticed that his bunk area had been searched more thoroughly than other inmates' bunks had. Plaintiff's mattress was strewn across the bunk, and items were in disarray. Some items had been confiscated, which, while technically contraband under facility policy, were not dangerous (e.g., an empty box used to store paper items and condiment packets). Every other inmate in Plaintiff's 8-bunk open dormitory bay who had similar items in their possession reported that they had not been confiscated in the same search. Additionally, all of Plaintiff's blank, unused envelopes had been confiscated, despite not being considered contraband by

facility policy. Plaintiff also discovered that a business card for a psychologist was missing after the search. Plaintiff attempted to ask the ward deputy about this after the search, but was told that none of these items were taken during the search. On this date, Plaintiff did not yet make the mental connection that this could have constituted a retaliatory search to harass him.

The following day, on October 12, 2024, Deputy Payne entered ward E3 at approximately 6:00 A.M. and proceeded to initiate shift change procedures. At approximately 7:10 A.M. Deputy Payne walked through the top tier of the ward with a binder of face pictures of inmates housed in the ward, looking for people sleeping on bunks other than those assigned to them, among other things. He instructed multiple inmates to pack their belongings because they were being transferred to another ward, with the implication that the move was for a punitive purpose. Plaintiff began taking notes regarding Payne's actions, which, in Plaintiff's experience, were aggressive, and out of step with the normative practices of the facility. At approximately 7:20 A.M. an inmate grabbed a trash bag from the deputy and walked past Plaintiff's bunk, stating that he was ordered to transferred to another ward by Payne because he had asked why Payne was being so aggressive when Payne had walked past his bunk and violently tore down papers

that had been placed against the wall. Following this exchange with Plaintiff, the inmate in question proceeded to walk down to another dormitory bay to ask another inmate to return books that had been loaned to him. In the process, Payne shouted from the bottom tier that the inmate being transferred should not "wake up people in my ward" which, ironically, woke up most of the people in the ward. An inmate in the bay that Payne had shouted at got to his feet and stated to Payne that his shouting had awakened him, and asked that Payne not shout in the ward. Payne's response was to order that inmate to pack his belongings to be transferred as well, again with the implication that the move would be to a punitive ward. At this, Plaintiff responded by stating that Deputy Payne's threats constituted unlawful retaliation. Plaintiff's statement was not vulgar, threatening, harassing, or unduly loud. Payne replied in a low, groaning voice "It's not retaliation."

At 7:30 A.M. Deputy Payne walked past Plaintiff's bunk area. Jason Bruener, an inmate whose bunk was situated next to Plaintiff's, asked Payne for his employee ID number. Payne replied "You'll get it when you get it, most people here already know my EID anyway." Bruener responded that Payne had an obligation pursuant to facility policy to provide his employee ID number when asked. Payne replied "You'll get it when you get it. Do your own time and mind your own business, or

I'll give you more time when I pack you out." Payne subsequently walked back by

Plaintiff's bunk area at 7:44 A.M. and proceeded to closely inspect Bruener's bunk

area, whispering something inaudible as he walked past. As he left the area,

without making eye contact with anyone, he rapidly stated the numbers "16015."


At 7:50 A.M. Deputy Payne told some inmates that he had decided to reverse

course, and that he would not transfer previously identified inmates to another

ward. At 8 A.M. the ward was "unlocked" and Plaintiff was allowed, alongside

other inmates, to move about the ward. Plaintiff proceeded to ask the inmates who

had been targeted by Payne what had happened, what they had said, and what

Payne had said to them. During these conversations, Plaintiff took notes. Inmate

Germontez Mosely stated that Payne had told him that he had been sent to E3 that

day to "be the enforcer" and to "fuck things up." Shortly after this, at

approximately 8:30 A.M. Plaintiff overheard Payne conversing with the ward

deputy of the neighboring ward, E4. Payne could be heard asking for advice on

how to articulate a plausible security concern related to Plaintiff's note-taking and

prior statement that Payne's actions constituted illegal retaliation. At the end of the

conversation, the E4 ward deputy stated "you've articulated a security concern to

me, but..." and then proceeded to point upward, seemingly indicating the need to

convince higher-ups in the facility administration that Plaintiff's note-taking and verbal complaint constituted a security concern.

At 9:19 A.M. Plaintiff was sitting next to another inmate, Daniel Duran, at a table in the ward. Deputy Payne stood approximately ten feet away. Plaintiff asked Payne if it was true that he had been sent to E3 to "screw things up." Payne responded that he had been sent to E3 to "tighten things up" because E3 was the "worst ward" in "many ways." When Plaintiff asked Payne how E3 was the worst ward, Payne refused to explain. Upon information and belief, some supervisors with the El Paso County Sheriff's Office send selected deputies into jail wards with orders to provoke reactions from inmates in order to justify harsh staff responses against them. Plaintiff suspected that Payne had been sent to intentionally inflame tensions in the ward and provoke a reaction. Approximately two minutes later, Plaintiff asked Payne if he had been sent to E3 by a Sergeant or some other supervisor within the Detention Bureau. Plaintiff did not share his underlying suspicions with Payne regarding the reason for his placement in E3. Plaintiff merely asked who had sent him to the ward that day. Payne responded, aggressively, "It's none of your business how we handle our security concerns. I

know you want to file a lawsuit and grieve everybody, but it's none of your business."

Following these interactions, Plaintiff proceeded to take more notes and ask inmates additional questions about their experiences with Payne, and spent much of the rest of the day planning a roleplaying game session with other inmates. At 1:30 P.M. Payne walked past Plaintiff as he planned the roleplaying game session for later that day. Payne ordered Plaintiff to pack his belongings, and stated that he was being transferred to another ward. When Plaintiff asked Payne why this was occurring, Payne did not answer the question. Plaintiff proceeded to pack his belongings as ordered, and when other inmates saw that he was being transferred, they approached Payne to complain about suspected retaliation. Payne reportedly replied that it was "a shame" and "unfortunate" that Plaintiff was being transferred, without indicating that Payne had, in fact, requested the transfer. At approximately 1:45 P.M. Plaintiff was taken out into the hallway by Payne. Once in the hallway, Payne stated that Plaintiff was being issued a disciplinary citation for "deviant and delinquent behavior" and being transferred as a result of the citation. Plaintiff asked what the citation was for, to which Payne replied "You know what it was for. It was for your behavior from when I told you to mind your own business."

Plaintiff was then taken upstairs to the ward "F2" and remained housed in F2 until he was ultimately transferred to the Colorado Department of Corrections in November, 2024.

On October 15, 2024 (three days after the incident involving Payne), Plaintiff was informed in writing that he had been ejected from the law library program for refusing to attend scheduled law library sessions at least twice in the prior 60 day period. Upon information and belief, other inmates who refused to attend almost every session (on average, twice per week) in this same period did not have their access to the law library program revoked.

On October 16, 2024 (four days after the incident involving Payne), F2 was subject to a "shakedown" search. During this search, Deputy Lacey came to Plaintiff's bunk, instructed Plaintiff to come downstairs, and presided over the placement of Plaintiff in handcuffs. Deputy Lacey was a previous subject of Plaintiff's grievances. Plaintiff was subsequently taken to the intake area by multiple deputies and subjected to a humiliating and degrading strip search. The handcuffing and strip searching of Plaintiff appeared to occur without cause, and Plaintiff was provided no justification by the staff for the strip search. Further, Plaintiff knows

of no possible justification for the search, as Plaintiff did not possess drugs, weapons, or other dangerous contraband or associate with any inmates who did. Upon information and belief, such an invasive search must be approved by a shift supervisor or higher-ranking deputy within the El Paso County Sheriff's Office Detention Bureau. Upon return to F2, Plaintiff asked a number of deputies for their employee ID numbers. Deputies Riley and Larkin provided theirs. Deputy Slowey stated "I'm not going to give you a fucking thing."

Weeks passed, and Plaintiff was still housed in F2. During this time, Plaintiff was served with a copy of Payne's complaint by the facility disciplinary officer, which cited Plaintiff for the offense of "Deviant and Delinquent Behavior." The complaint stated, in part, that Plaintiff "became disruptive and challinging (sic) my decisions... stating that I was acting against the law." Plaintiff asked to have a formal hearing on the matter. The disciplinary officer scheduled the hearing for October 24, 2024. During the hearing, Plaintiff requested that multiple inmates be questioned regarding the incident, maintained that he was not disruptive as Payne alleges, and asserted that the disciplinary complaint was unlawful because it was retaliatory. Plaintiff attempted to submit a five page memorandum of law to the

hearing officer, but this was refused because the hearing officer stated that he already knew about the legal concept of retaliation.

Shortly after the completion of the hearing, Plaintiff was transferred to the Department of Corrections. No decision of the hearing officer was ever communicated to Plaintiff. Upon transfer to the Department of Corrections, Plaintiff packed, among other items, legal paperwork, notes, and Plaintiff's copy of the National Lawyers' Guild's "Jailhouse Lawyer's Handbook". Upon arrival at the Denver Reception and Diagnostic Center, a Department of Corrections Facility, Plaintiff noticed that his copy of the "Jailhouse Lawyer's Handbook" was missing. In March of 2025, Plaintiff mailed a written notice of intent to sue to the Legal Department of the El Paso County Sheriff's Office, in accordance with the requirements of the Colorado Governmental Immunity Act. Plaintiff asserted various constitutional, as well as state tort claims, against various deputies for alleged retaliation.

## Claim One: Discrimination in Violation of the Americans With Disabilities Act

The El Paso County Sheriff's Office maintains discriminatory policies in wards B2 and F1 which exist for the sole purpose of making the mental health units uncomfortable, in order to discourage inmates from disclosing their mental health issues to staff and, by extension, reduce the number of inmates in mental health wards. As stated above, Deputy John Calhoun was overheard by Plaintiff in B2 stating that these policies were in place for this purpose. These policies prohibited, or severely restricted, the ability of mentally ill inmates (including Plaintiff) to access recreation facilities, jail commissary ordering, showers, phones, television, books, mail, written notices from the facility, or even the ability to get off their bunks and talk to each other, either at all (in the case of recreation, commissary ordering, mail, written notices and television), or for between 18 and 23 hours each day (in the case of showering, phones, and the ability to get off bunks or even speak). This, in spite of other open dormitory wards in the same facility not having such restrictive policies. These policies were implemented and enforced by the El Paso County Sheriff's Office, Sheriff Joe Roybal, John Doe Detention Bureau Chief, and Doe Shift Supervisors.

This constitutes discrimination in violation of the Americans With Disabilities Act, which prohibits discrimination in the provision of services or activities on the basis of a disability by government entities. 42 U.S.C. Section 12101 *et seq.*

Courts have consistently held that mental illnesses which impact a significant life function qualify as disabilities for the purposes of the ADA, and cannot be used as a basis for discrimination in the provision of services or activities. This is true, even in the context of jails and prisons. Thompson v. Davis, 295 F.3d 890, 898 n.4 (9th Cir. 2002) (Categorically denying parole to mentally ill prisoner would constitute unlawful discrimination in violation of ADA); Sites v. McKenzie, 423 F. Supp. 1190, 1197 (N.D.W.Va. 1976) (Excluding prisoner with mental illness from vocational rehabilitation programs violated Rehabilitation Act).

In Plaintiff's case, Post-Traumatic Stress Disorder and Major Depression clearly constitute mental illness, and interfere with major life functions. The mental disorders cause Plaintiff to have difficulty communicating with others, going outside, sleeping, and having the motivation to perform other fundamental tasks. These mental health disorders, therefore, constitute disabilities for ADA purposes.

Access to phones, television, books, mail, written notices, recreation facilities, showers, and the ability to get off one's bunk or talk to other inmates all qualify as services or activities for the purposes of the Act. *See, e.g.,* MAP v. Bd. of Trs. for Colo. Sch. for the Deaf & Blind, 2014 U.S. Dist. LEXIS 104020, No. 12-cv-02666-RM-KLM (D. Colo. April 28, 2014) (Finding that, *inter alia*, discrimination in access to recreation and television stated an ADA claim); Quillan v. Mich. Dept. of Corr., 2014 U.S. Dist. LEXIS 181855, No. 1:13-cv-160 (W.D. Mich. December 5, 2014) (Inmate suit alleging discrimination in access to phones on basis of disability allowed to proceed under ADA); Johnson v. Noland, 2025 U.S. Dist. LEXIS 33490, 2025 LX 194641, 2025 WL 603032, NO. 3:23-CV-1074-PPS-JEM (N. D. Ind. February 24, 2025) (Access to mail is a "service" for purposes of ADA).

For the foregoing reasons, Defendants established and enforced policies which discriminated in the provision of services or activities for the purposes of the ADA. Defendants did so for the unjustifiable reason of discouraging mentally ill prisoners from disclosing their mental health problems to staff, in order to cut down on occupancy in the jail's mental health wards, making the discrimination particularly reprehensible.

## Claim Two: Enforcement of an Official Policy or Custom Which is Void for Vagueness in Violation of the Fourteenth Amendment

Defendants El Paso County Sheriff's Office, John Doe Detention Bureau Chief, Sheriff Joe Roybal, Deputy Lacey, Deputy Payne, and Doe Deputies enforce and maintain a vague policy which effectively bars speech at any volume in the jail's open dormitory wards. The policy accomplishes this by giving deputies the latitude to bar all speech during daytime "lockdown" hours (sometimes for as much as 23 hours each day, as is the case in the ward "B2") which prohibits any speech which can be "heard from the desk" in the ward, serving as an effective prohibition on any speech, including speech which is whisper-quiet. Plaintiff has grieved the enforcement of this policy by several deputies, including Doe defendants. A John Doe Lieutenant within the El Paso County Sheriff's Office eventually responded to Plaintiff's numerous grievances on the subject by stating that the policy would not be changed, deputies can enforce volume restrictions however they see fit, and no further grievances would be addressed on their merits regarding this issue. For multiple reasons, this policy is unconstitutional.

First, the policy is unconstitutionally void for vagueness. A jail or prison policy "is void for vagueness if it (1) 'fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits,' or (2) 'authorizes or even encourages arbitrary and discriminatory enforcement.'" Ryan v. Scism, 474 Fed. Appx. 49, 52 (3d Cir. 2012) (quoting Hill v. Colorado, 530 U.S. 703, 732, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000)).

As to the first prong of the standard established in *Hill*, the policy enforced by defendants does not provide inmates of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits because the language of the policy (that deputies may regulate speech at their discretion, including by allowing them to state that they should not be able to hear inmates from an arbitrary location in jail wards) is vague, varies from deputy to deputy, varies from ward to ward as to the location of the deputy's desk, and insists that inmates regulate speech in accordance with a volume level which is so ill-defined that its definition depends on the individual hearing capacity of each deputy.

As to the second prong, the policy clearly authorizes and encourages arbitrary enforcement, as it encourages deputies to set an arbitrary level of volume which is

permitted during daytime hours. In Plaintiff's experience, several deputies enforce a policy of limiting conversational volume to a low level which would generally be acceptable indoors, while other deputies enforce an effective ban on all speech. Often, deputies do not provide any notice regarding what they consider to be an acceptable level of volume, and issue threats or disciplinary measures against inmates for so much as whispering during daytime hours without a reasonable opportunity to comprehend the restriction of volume the deputy intends to implement.

For these reasons, the policy is unconstitutionally void for vagueness.

### Claim Three: Enforcement of an Official Policy or Custom Which is Unconstitutionally Overbroad in Violation of the First and Fourteenth Amendments

The policy enforced by Defendants El Paso County Sheriff's Office, John Doe Detention Bureau Chief, Sheriff Joe Roybal, Deputy Lacey, Deputy Payne, and Doe Deputies, is also unconstitutionally overbroad. Restrictions on speech in prisons and jails are governed by the First Amendment, and must bear a

"reasonable relationship" to a legitimate penological interest. Turner v. Safley, 482 U.S. 78, 89 (1987). S*ee, e.g.,* Wolf v. Ashcroft, 297 F.3d 305, 306-10 (3d Cir. 2002) (prohibition on showing R- and NC 17-rated movies in prison context governed by *Turner* standard); Benzel v. Grammer, 869 F.2d 1105, 1108 (8th Cir. 1989) (restrictions on telephone use governed by *Turner* "reasonable relationship" standard).

The test established by the Supreme Court in *Turner* to determine if a prison regulation is reasonably related to a valid penological interest contains multiple prongs:

1. [Whether there is] a "valid, rational connection" between the prison regulation and the legitimate governmental interest put forward to justify it. ... [A] regulation cannot be sustained where the logical connection between the regulation and the asserted goal is so remote as to render the policy arbitrary or irrational. ...

2. ... [W]hether there are alternative means of exercising the right that remain open to prison inmates. ...

3. ... [T]he impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally.

4. ... [T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation... But if an inmate claimant can point to an alternative that fully accommodates the prisoner's rights at *de minimis* cost to valid penological interests, a court may consider that as evidence that the regulation does not satisfy the reasonable relationship standard. (*Id.*, at 89-91.)

The policy in question fails on all four prongs.

First, the logical connection between the policy and its purported goal is very strained. The policy aims to limit speech volume during daytime hours with the supposed goal of maintaining order. However, in practice, the requirement enforced by many deputies that no speech be permitted whatsoever has a very strained relationship with this purported goal. There is little, if any, rational relationship between prohibiting whisper-quiet conversation and the maintenance of order within an institutional environment.

Second, alternative means of exercising the right to free speech with each other do not exist when all speech is effectively barred.

Third, accommodation of the right to speak at a reasonable volume during daytime hours would not have a significant impact on the security or order of the facility, other inmates, or staff. Additionally, defendants cannot plausibly allege a "ripple effect" from allowing quiet conversation during daytime lockdown hours, as such inconsequential accommodation would have a negligible impact (if any) on order and security.

Finally, there exists a reasonable alternative which accommodates the rights of inmates to speak to each other at *de minimis* cost to defendants. Defendants could permit speech at a defined volume level, and specifically instruct deputies that barring all speech, including whispering, during daytime hours is not permitted. Additionally, as stated above in the recitation of the facts in this complaint, Deputy Broske indicated that several policies, such as the one at issue, are enforced by the El Paso County Sheriff's Office in order to "make this place like Rikers," an apparent reference to punitive intent. In pre-trial detention environments, like the El Paso County Jail, the imposition of intentionally punitive measures against pre-

trial detainees is unconstitutional and serves no valid penological purpose. Bell v. Wolfish, 441 U.S. 520 (1979).

Under the *Turner* standard, courts have held that, when prison officials' justification for a policy or practice is not provided in good faith, or when there is actually an ulterior, impermissible motive for the policy, such policies are not reasonably related to valid penological interests. *See, e.g.,* Wares v. VanBebber, 319 F. Supp. 2d 1237, 1248-50 (D. Kan. 2004) (holding "defendants are not entitled to the deference afforded to them under the *Turner* framework if their conduct was not actually motivated by legitimate penological interests at the time they acted"; citing other cases rejecting pretextual justifications); Quinn v. Nix, 983 F.2d 115, 118 (8th Cir. 1993) (restrictions on haircuts were not related to the valid interest of curtailing gang activity because that was not the actual motivation of the restrictions); Williams v. Lane, 851 F.2d 867, 872-73 (7th Cir. 1988) (courts need not defer to prison officials' views if they are unworthy of belief); Swift v. Lewis, 901 F.2d 730, 731-32 (9th Cir. 1990) (prison officials must submit evidence that the interests they cite are the actual reasons for the policy).

For the reasons stated above, there is reason to believe that the policy enforced by defendants is an "exaggerated response" to a security concern. *Turner*, 482 US at 91.

Accordingly, its enforcement is unconstitutional.

## Claim Four: Enforcement of an Official Policy or Custom Which Violates Article II, Section 10 of the Colorado Constitution

In the event that Plaintiff's arguments under the *Turner* standard are unpersuasive, the policy enforced by Defendants El Paso County Sheriff's Office, John Doe Detention Bureau Chief, Sheriff Joe Roybal, Deputy Lacey, Deputy Payne, and Doe Deputies and Shift Supervisors also likely violates the more expansive protection afforded to speech under Article II, Section 10 of the Colorado State Constitution.

This court has supplemental jurisdiction to consider matters of state law. Additionally, the Due Process Clause of the 14th Amendment of the United States

Constitution protects state-created liberty interests, such as those created by state constitutions, thus making this a federal question as well.

The Colorado Supreme Court has a long history of recognizing that the free speech clause of Article II, Section 10 of the Colorado Constitution provides greater protection of speech than does the First Amendment. Bock v. Westminster Mall Co., 819 P.2d 55, 60 (Colo. 1991) ("Colorado's tradition of ensuring a broader liberty of speech is long. For more than a century, [the Colorado Supreme Court] has held that Article II, Section 10 provides greater protection of speech than does the First Amendment.").

This principle has resulted in broader standards of review being applied to free speech claims under Colorado's constitution. *See, e.g.,* People v. Ford, 773 P.2d 1059, 1066 (Colo. 1989) (Under broader protection afforded to speech under Colorado Constitution, "community tolerance" standard is appropriate test to determine if otherwise obscene material nonetheless constitutes protected speech in Colorado).

The question of whether or not the "reasonable relationship" standard of review established in *Turner* is applicable to free speech claims of prisoners under Colorado's constitution is an unsettled question of law. Plaintiff has found no precedent in which the Colorado Supreme Court or the Colorado Court of Appeals have held that the standard applies to free speech claims under the state constitution.

It is likely that, under the broader protections afforded to speech pursuant to Article II, Section 10 of Colorado's constitution, the Colorado Supreme Court would apply a more expansive standard of review, which would be more consistent with the state of First Amendment case law in prisoner cases prior to the establishment of the *Turner* standard, and which is more aligned with the dissent in *Turner's* 5-4 decision. *Turner*, 482 U.S. at 101 (1987) (Stevens, J, Dissenting) ("[I]f the standard can be satisfied by nothing more than a 'logical connection' between the regulation and any legitimate penological concern perceived by a cautious warden... it is virtually meaningless.")

Accordingly, Plaintiff believes that this issue will warrant certification of the question to the Colorado Supreme Court pursuant to C.A.R. 21.1, which provides,

in pertinent part, "The [Colorado] supreme court may answer questions of law certified to it by ... a United States District Court, or other federal court, when requested by the certifying court, if there is involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the certifying court that there is no controlling precedent in the decisions of the [Colorado] supreme court."

Additionally, C.A.R. 21.1 provides that questions of law may be certified to the Colorado Supreme Court by a United States District Court "upon said court's own motion or upon the motion of any party in which the certified question arose."

Therefore, Plaintiff requests that this court grant the attached motion to certify this question to the Colorado Supreme Court.

## Claim Five: Retaliation, and Conspiracy to Retaliate, for Protected Speech in Violation of the First Amendment of the United States Constitution

Defendants Deputy Payne, Deputy Lacey, Doe Deputies, and Doe Shift Supervisors retaliated against Plaintiff for exercising the right to utilize the El Paso County Jail's grievance procedures, and for speech which is otherwise protected outside of the grievance process.

Retaliation by state actors against a citizen because of their exercise of a constitutionally protected right is prohibited by the First Amendment. Poole v. County of Otero, 271 F.3d 955, 960 (10th Cir. 2001) This is true, even in the context of prisons and jails, because the First Amendment continues to protect several forms of speech while prisoners are incarcerated. Gee v. Pacheco, 627 F.3d 1178, 1189 (10th Cir. 2010) (Plaintiff engaged in protected speech by filing prison grievances); Gowen v. Winfield, 130 F.4th 162, 174 (4th Cir. 2025) (Inmate's speech protected by First Amendment when he verbally complained to officers about heat in cells).

Defendants Doe Deputies ransacked Plaintiff's belongings and confiscated several items, including those which were not prohibited by policy. The same deputies largely left untouched the belongings of others in Plaintiff's open dormitory bay who did not regularly engage in the grievance process. Additionally, Plaintiff's copy of the National Lawyers' Guild's "Jailhouse Lawyer's Handbook" and associated American Civil Liberties Union correspondence were visible on Plaintiff's bunk, while others in Plaintiff's open dormitory bay did not possess such litigation-oriented documents or books. This occurred approximately two weeks following Deputy Maltese's conversation with Plaintiff, in which he stated that several other deputies were upset at Plaintiff's use of the grievance process.

The following day, Defendant Deputy Payne stormed through the ward in which Plaintiff was housed, blatantly threatening to retaliate against other inmates for raising complaints with him, and ultimately retaliating against Plaintiff for complaining that Payne's conduct was apparently illegal. During what can only be described as an emotional tirade, Payne threatened to initiate multiple disciplinary transfers against inmates who had complained about his conduct and stated that he would "give... more time" to Jason Bruener for not "mind[ing] [his] own business" by requesting Payne's employee ID as provided for in EPSO policy. Payne then

went out of his way to closely inspect Bruener's bunk area shortly thereafter, and issued a disciplinary citation and transfer order against Plaintiff for taking notes and complaining about Payne's threatening, unprofessional and apparently illegal behavior. The disciplinary citation carried a maximum punishment of 15 days' time in segregation.

Three days after this, Plaintiff was ejected from the jail's law library program for engaging in behavior which almost all other participants in the program engaged in on a regular basis, without being ejected themselves. The day following this ejection, Plaintiff was approached by Deputy Lacey, brought down to the jail's intake area in handcuffs and subjected to a humiliating and degrading strip search, in which he was ordered to display and lift his genitals and spread open his rectum for deputies for no apparent reason.

Upon Plaintiff's transfer to the Department of Corrections approximately two weeks later, his copy of the Jailhouse Lawyer's Handbook was missing, despite being permitted to be brought during the transfer pursuant to a prior notice provided to Plaintiff by the El Paso County Sheriff's Office.

To state a retaliation claim under the First Amendment, a plaintiff must demonstrate three elements: (1) that he was engaged in constitutionally protected activity; (2) the defendant took actions that caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (3) the adverse actions were substantially motivated as a response to the plaintiff's exercise of constitutionally protected rights. Shero v. City of Grove, Okla., 510 F.3d 1196, 1203 (10th Cir. 2007).

In the present case, the campaign of harassment directed against Plaintiff clearly satisfies all three prongs of the test.

First, utilizing a prison grievance procedure constitutes protected speech. Gee v. Pacheco, 627 F.3d 1178, 1189 (10th Cir. 2010) (Filing of prison grievances satisfies protected speech element of retaliation claims); Johnson v. Whitney, 723 F. App'x 587, 594 (10th Cir. 2018) (A prisoner's "filing of a grievance qualifies as protected activity under the first element" of a retaliation claim). This is true even when, as is the case in the events giving rise to this complaint, some of the prisoner's grievances are raised verbally. See, e.g., Murphy v. Roberts, No. 2:19-cv-00852-JNP, 2025 U.S. Dist. LEXIS 55303 at *13 - *16, 2025 WL 895129, 2025 LX

204303 (D. Utah March 24, 2025) (Inmate's retaliation claim premised upon verbal complaint survived summary judgment motion because it was an informal verbal grievance; and claim that inmate's speech was disruptive was genuine dispute of material fact for jury to decide); *also see* Conkleton v. Muro, No. 08-cv-02006-MSK-MJW, 2011 U.S. Dist. LEXIS 26393, 2011 WL 902440 (D. Colo. Mar. 28, 2011) (Inmate's verbal articulation of intent to file grievance constitutes protected speech).

The El Paso County Jail's grievance procedure requires inmates to verbally raise issues with their ward deputy prior to filing a written grievance. This is a fact recognized by both the United States District Court for the District of Colorado and the Tenth Circuit Court of Appeals. Carr v. El Paso County Jail, No. 1:21-cv-00392-RBJ-SKC, 2023 U.S. Dist. LEXIS 62083 (D. Colo. March 20, 2023) ("The El Paso County Sheriff's Inmate Handbook provides the procedural requirements for the filing of grievances by inmates in the jail... The inmate handbook requires that before an inmate files a 'formal complaint' he must first 'attempt to receive satisfaction through informal channels' by orally raising the issue with the Ward Deputy"); Carr v. El Paso County Jail, No. 23-1104, 2023 U.S. App. LEXIS 23491 (10th Cir. Sept. 5, 2023) ("The El Paso County Jail's inmate handbook details the

jail's grievance process. An inmate must first seek informal resolution by 'bringing the grievance, orally, to the Ward Deputy'").

Accordingly, Plaintiff's verbal attempt to raise an issue with Defendant Deputy Payne, who was acting as a ward deputy at the time of the incident in question, was a required component of the jail's grievance procedure, and constituted protected speech under the First Amendment.

Additionally, courts have held that verbal complaints raised by inmates regarding jail and prison conditions constitute protected speech, even when not required by the formal grievance process. Gowen v. Winfield, 130 F.4th 162, 174 (4th Cir. 2025) (Verbal complaint by inmate about level of heat in cells satisfied protected speech prong of retaliation analysis); Pearson v. Welborn, 471 F.3d 732 (7th Cir. 2006) (Prisoner engaged in protected speech by verbally complaining about conditions in prison unit); Mitchell v. Farcass, 112 F.3d 1483 (11th Cir. 1997) (Prisoner who verbally presented inmate complaints to prison officials engaged in protected speech); Clarke v. Stalder, 121 F.3d 222 (5th Cir. 1997) (Prisoner stated a First Amendment retaliation claim because, *inter alia,* verbal confrontation of prison staff constituted protected speech) (*rev'd on other grounds, en banc, by* Clarke v.

Stalder, 154 F.3d 186 (5th Cir. 1998)). At least one court has also found that documenting the complaints of other inmates for the purposes of litigation or filing grievances constitutes protected speech. Cain v. Lane, 857 F.2d 1139, 1143 (7th Cir. 1988).

Second, courts have found that confiscation of property, disciplinary citations which result in (or could likely result in) placement in segregation, false disciplinary charges, transfer, and abusive searches satisfy the "ordinary firmness" standard, or implicate other constitutional standards which are substantially similar to ordinary firmness review. *See, e.g.,* Zarska v. Higgins, 171 Fed. App'x. 255, 259 (10th Cir. 2006) (The filing of a disciplinary complaint in retaliation for protected speech satisfies the ordinary firmness standard); Chapman v. Nichols, 989 F.2d 393, 395 (10th Cir.1993) (A strip search "represents a serious intrusion upon personal rights"); Kennedy v. Los Angeles Police Dep't., 901 F.2d 702, 711 (9th Cir. 1989) ("Strip searches involving visual exploration of the body cavities are dehumanizing and humiliating"); Conkleton v. Muro, No. 08-cv-02006-MSK-MJW, 2011 U.S. Dist. LEXIS 26393, 2011 WL 902440 (D. Colo. Mar. 28, 2011) (Filing of disciplinary report which would likely result in placement in segregation satisfies ordinary firmness standard); Taituave v. McDowell, No. 5:18-cv-01106-

JVS-FFM, 2020 U,S, Dist. LEXIS 130025, at *20 (C.D. Cal. Mar. 31, 2020) ("Cell searches and disciplinary charges constitute adverse actions that would chill a person of ordinary firmness"). Additionally, Plaintiff, himself, was deterred from filing a grievance following the abusive strip search.

Third, the defendants' conduct was causally connected to Plaintiff's protected speech. Defendant Deputy Payne's disciplinary complaint openly states that it was filed because Plaintiff complained that Payne's actions were illegal, and because Plaintiff took notes about the incident in question. Payne's act of transferring Plaintiff to another ward, which occurred simultaneously alongside his filing of the disciplinary complaint, was also substantially motivated by the speech in question.

The facts of this case are closely aligned with those of Ajaj v. Fed. Bureau of Prisons, No. 08-cv-02006-MSK-MJW, 2011 U.S. Dist. LEXIS 26393, 2011 WL 902440 (D. Colo. Mar. 10, 2011). In *Ajaj,* the plaintiff, a federal prisoner, alleged that he was retaliated against by a prison guard who wrote a disciplinary report against him for "conduct disruptive to security" because of his engaging in a hunger strike. This court held that the plaintiff stated a retaliation claim, *inter alia,*

because the disciplinary report, which complained of the plaintiff's protected speech, was, therefore, causally connected to plaintiff's protected speech.

Defendants' ejection of Plaintiff from the jail's law library for reasons that ordinarily would not result in ejection; Defendants' abusive and degrading strip search of Plaintiff for no apparent reason; Defendants' ransacking and confiscation of Plaintiff's belongings despite not treating the belongings of other inmates in the same physical area in a similar fashion; and Defendants' confiscation of Plaintiff's copy of the Jailhouse Lawyer's Handbook, a book which was obviously related to Plaintiff's legal efforts, all occurred within days of each other, and within two-to-three weeks of Plaintiff's ominous conversation with Deputy Maltese, who stated that several other deputies were upset that Plaintiff had complained about them via the facility's grievance process. Such close temporal proximity, combined with the type of apparently discriminatory or unusual treatment which accompanied each of of these acts, has been held to sufficiently establish a presumption of causality in retaliation cases in the 10th Circuit. *See, e.g.,* Smith v. Maschner, 899 F.2d 940, 948 (10th Cir. 1990).

## Claim Six: Retaliation, and Conspiracy to Retaliate, for Protected Speech in Violation of Article II, Section 10 of the Colorado Constitution

In the event that Plaintiff's arguments are unpersuasive under First Amendment analysis for any reason, it is likely that, under the broader protections afforded to speech under Article II, Section 10 of the Colorado Constitution, the conduct of defendants Deputy Payne, Deputy Lacey, Doe Deputies, and Doe Shift Supervisors constituted unlawful retaliation which violated Plaintiff's free speech rights.

## Relief Requested

Plaintiff respectfully prays that this court award the following relief as to each of the above claims:

As to Claim One, Plaintiff respectfully requests relief in the form of nominal damages from defendants Sheriff Joe Roybal and John Doe Detention Bureau Chief in their individual capacities, and El Paso County Sheriff's Office in its official capacity.

As to Claim Two, Plaintiff respectfully requests relief in the form of nominal damages from defendants Sheriff Joe Roybal, Deputy Lacey, Deputy Payne, Doe Deputies, and John Doe Detention Bureau Chief in their individual capacities, and El Paso County Sheriff's Office in its official capacity.

As to Claim Three, Plaintiff respectfully requests relief in the form of nominal damages from defendants Sheriff Joe Roybal, Deputy Lacey, Deputy Payne, Doe Deputies, and John Doe Detention Bureau Chief in their individual capacities, and El Paso County Sheriff's Office in its official capacity.

As to Claim Four, Plaintiff respectfully requests relief in the form of nominal damages from defendant El Paso County Sheriff's Office in its official capacity.

As to Claim Five, Plaintiff respectfully requests relief in the form of nominal damages from defendant El Paso County Sheriff's Office in its official capacity, and from defendants Deputy Payne, Deputy Lacey, Doe Deputies, and Doe Shift Supervisors in their individual capacities; and punitive damages from defendants Deputy Payne, Deputy Lacey, Doe Deputies, and Doe Shift Supervisors in their individual capacities.

As to Claim Six, Plaintiff respectfully requests relief in the form of nominal damages from defendant El Paso County Sheriff's Office in its official capacity, and from defendants Deputy Payne, Deputy Lacey, Doe Deputies, and Doe Shift Supervisors in their individual capacities; and punitive damages from defendants Deputy Payne, Deputy Lacey, Doe Deputies, and Doe Shift Supervisors in their individual capacities.

The undersigned hereby declares, under penalty of perjury, that the facts contained in this complaint are correct and true to the best of his knowledge.

Respectfully submitted this _15th_ day of _July_, 20_25_.

Signature _Travis w_

Travis Hodge, Plaintiff



US POSTAGE >> PITNEY BOWES

ZIP 81054
02 7H
0006162276

$ 004.440

JUL 15 2025

FIRST-CLASS

CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL

CONFIDENTIAL

Travis Hodge
#202334
Bent County Correctional Facility
11560 Co RD FF 75
Las Animas, Co, 81054

United States District
Court for the District of Colorado
901 19th St. Denver, Co, 80294



BCCF  7/10/25
Facility:                    Date Rec'D
SIGS  SHIPo  QS
DOC Employee Last Name    ID #        unit
202394          H0330      704
DOC #          Offender Last Name      int